IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORAH KAYS, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 1:13-CV-02468 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | (Judge Kane) |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## **MEMORANDUM**

Plaintiff Deborah Kays has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Kays' claim for social security disability insurance benefits. (Doc. 1).

Disability insurance benefits are paid to an individual if that individual is disabled and "insured." Kays met the insured status requirements of the Social Security Act through December 31, 2015. Tr. 14.[1] Therefore, to be entitled to disability insurance benefits, Kays must establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A).

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

I.   **BACKGROUND**

Kays protectively filed her application for disability insurance benefits on May 24, 2011, claiming that she became disabled on August 31, 1999.  Tr. 10, 89. Kays has been diagnosed with degenerative disc disease of the cervical spine with radiculopathy, fibromyalgia, Lyme disease, and depression.  Tr. 12-13.  On July 21, 2011, Kays' application was initially denied by the Bureau of Disability Determination.  Tr. 73.

On August 5, 2011, Kays requested a hearing before an administrative law judge ("ALJ").  Tr. 77.  The ALJ conducted a hearing on April 24, 2012, where Kays was represented by counsel.  Tr. 36-62.   On May 25, 2012, the ALJ issued a decision denying Kays' application.  Tr. 10-19.  On August 21, 2013, the Appeals Council declined to grant review.  Tr. 1.  Kays filed a complaint before this Court on September 27, 2013, and this case became ripe for disposition on March 5, 2014, when Kays declined to file a reply brief. (Docs. 1, 12, 13).

Kays appeals the ALJ's determination on the sole ground that the ALJ erred in rejecting the opinion of two treating physicians.  (Doc. 12).  For the reasons set forth below, the decision of the Commissioner is affirmed.

II.   **STATEMENT OF RELEVANT FACTS**

Kays was forty-seven years of age at her date last insured; she is a high school graduate and is able to read, write, speak, and understand the English

language. Tr. 44-45, 113. Kays has past relevant work experience as a sewing machine operator, which is classified as light, semi-skilled work. Tr. 56.

### A. Medical Records from the Relevant Period

On June 2, 2000, an MRI was conducted on Kays' cervical spine. Tr. 180. This MRI revealed some straightening of the cervical spine, consistent with muscle spasms. Id. The MRI also showed "[p]osterior ridging at C4-5 and C5-6 somewhat more prominent at the left at midline [and] moderate stenosis[2] of the canal at C5-6 and somewhat less stenosis at C4-5." Id.

On June 8, 2000, Kays presented to David Basch, M.D. for an orthopedic consultation. Tr. 205-06. Kays complained of neck pain that radiated down her left arm and shoulder, but was not accompanied by numbness or tingling. Tr. 205. Dr. Basch noted that there was some mild stiffness in Kays' neck range of motion in the forward flexion, hyperextension, and side bending. Id. There was pain at the extremes of the range of motion with side bending and rotation. Id. A Spurling's test was positive, but Kays had a full range of motion in her shoulders, good strength in her upper extremities, and intact and symmetric sensations and reflexes. Id. Dr. Basch diagnosed Kays with cervical radiculopathy and discussed surgical and non-surgical options of treatment. Tr. 205-06.

---

[2] "Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine." MayoClinic.com, Spinal Stenosis Definition, *available at* http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105 (last visited October 28, 2014).

3

Kays returned to Dr. Basch on June 20, 2000 for a follow-up appointment. Tr. 203. Kays had finished a course of oral steroid medication and had been attending physical therapy. Id. She reported "doing much better" and noted that her arm pain had completely resolved and she only had "very mild stiffness and soreness" remaining in her neck. Id. Her remaining "mild discomfort" was "very tolerable." Id. Kays had a full range of motion in her neck and shoulders, had no tenderness, and a neurological examination was intact. Id. She was responding well to conservative treatment and had ceased using all medication, including her pain medication. Id. Dr. Basch assessed Kays with "[c]ervical radiculopathy on the left secondary to herniated discs much improved." Id.

A second cervical MRI was conducted on May 3, 2001. Tr. 179. This MRI revealed that the bony ridging was "somewhat more prominent than on the previous study causing more prominent diffuse spinal stenosis" at the C5-6 level, and more lateral spinal stenosis at the C4-5 level. Id.

On June 20, 2001 Steven Dorsky, M.D. evaluated Kays to provide a surgical opinion. Tr. 201, 204. Kays reported one year of progressive symptomology with increased symptoms over the previous several months. Tr. 201. She also reported "intolerable" pain in her arms and neck, but was able to sit and stand independently and had an unremarkable gait. Id. Dr. Dorsky noted mild tenderness in the paracervical musculature, a limited, painful range of motion in the neck, and a full,

painless range of motion in the shoulders; a neck extension caused some bilateral arm pain. Id. Kays had intact sensations, and clonus and Babinski signs were negative. Id. Dr. Dorsky opined that surgery was an option to treat Kays' impairments. Tr. 204.

On August 21, 2001, Allan Gardner, M.D. evaluated Kays and provided a second surgical opinion. Tr. 198-99, 202. Kays' reported that, although physical therapy "seemed to have helped for a while," she continued to have recurring attacks of pain in the shoulders, neck, and arms. Tr. 198. Dr. Gardner wrote that Kays was "not currently on any medication. She knows the exercises that she learned in physical therapy but does not do them with any consistency." Id.

Kays had a normal gait and station, and was able to heel walk, toe walk, and tandem walk without difficulty. Tr. 199. She had a full cervical range of motion with some discomfort at the full extension and in the flexion. Id. Her neck muscles were uncomfortable with compression and lateral bending, but foraminal encroachment tests were negative and there was no tenderness over the neural foramina. Id. Her sensations were intact and her reflexes were normal. Id.

Dr. Gardner noted that MRI scans demonstrated some spinal stenosis, but "the spinal cord itself still seems to have plenty of room [and the] nerves are not obviously pinched as they exit through the foramen." Id. Dr. Gardner opined that Kays' "main problem [was] really a muscular cervical syndrome." Id. He stated

that "I don't think any surgery at all is indicated for her back.  I suspect . . . that she could have the two level fusion that had been suggested to her and be no better for it."  Id.  Instead of surgery, he recommended Kays "continue to catch religion about her range of motion exercises and tension relaxation exercises as well."  Id.

### B.     Post-Relevant Period Medical Records

On October 7, 2005, ten months after her date last insured, Kays presented to Yevgeniy Khesin, M.D. for an initial neurological evaluation.  Tr. 195-97.  Dr. Khesin noted that MRI scans in 2000 and 2001 "did demonstrate the presence of quite significant protrusions of the C4-C5 and C5-C6 discs pushing on the corresponding roots."  Tr. 195.  However, Dr. Khesin noted that Kays' medical issues were "in remission for quite a long time until last Saturday when she developed pain in the neck as well as in the left arm[.]"  Id.  Kays reported that she was again experiencing tightness in the neck and tingling down her left arm, although she had no problems with strength and no difficulties walking.  Id.

Kays had no issues with coordination, stance, or gait.  Tr. 196.  She had normal muscle tone, bulk, and power, and had full strength throughout her extremities.  Id.  She had normal sensations, a full range of motion in the neck, and no tenderness to palpation.  Id.  Dr. Khesin diagnosed Kays with a probable "relapse of cervical radiculopathy[.]"  Id.  He prescribed Neurontin, Ultracet, and physical therapy.  Tr. 197.

On May 24, 2011, Dr. Khesin completed a residual functional capacity assessment, and opined that Kays was capable of occasionally lifting or carrying two to three pounds. Tr. 152. He believed that Kays could stand or walk for one hour during an eight-hour workday, and could only sit for three to four hours during a workday. Id. Kays was limited in her ability to push or pull with her extremities; she could occasionally bend but could never kneel, stoop, crouch, balance, or climb. Tr. 152-53. Dr. Khesin opined that Kays was impaired in her ability to reach, handle, finger, feel, see, hear, speak, taste, smell, and in her continence. Tr. 153. She was also limited in her ability to tolerate poor ventilation, heights, or temperature extremes. Id. Dr. Khesin based his opinion on his examinations of Kays. Tr. 152-53.

On April 12, 2012, John Fisher, M.D., Kays' treating physician, wrote a letter stating that he was treating Kays "for multiple medical conditions which have rendered her totally and permanently disabled." Tr. 290. Dr. Fisher noted that Kays was affected by degenerative arthritis and disc disease, as well as Lyme disease and fibromyalgia. Id. He stated that it was his "medical opinion that Deborah Kays is unable to work due to medical conditions." Id. Similarly, on April 20, 2012 Dr. Khesin wrote a letter stating that Kays suffers from chronic pain and fatigue "as a result of cervical radiculopathy due to degenerative disc disease

in the cervical spine." Tr. 289.  Dr. Khesin also opined that Kays "is unable to work due to her medical condition." Id.

### C.   The Administrative Hearing

On April 24, 2012, Kays' administrative hearing was conducted.  Tr. 36-62.  At that hearing, Kays testified that she had stopped working in 1999 after she began experiencing a severe, constricting pain in her left, non-dominant arm.  Tr. 47.  Kays was also experiencing stiffness, tightness, and constant aching in her neck.  Tr. 48.  She stated that she felt pain in her hands, although she did not drop any objects as a result.  Tr. 49.

Kays testified that, during the relevant period, she was only able to comfortably lift ten pounds.  Tr. 51.  She reported only being able to sit for twenty or thirty minutes, and only being able to stand or walk for thirty minutes.  Id.  She generally spent her days doing household chores such as cleaning, laundry, and cooking, although she needed to rest when performing chores.  Tr. 48, 52.  However, Kays only had good days twice per week and stated that, on her bad days, she was unable to perform chores.  Tr. 52-53.

After Kays testified, Gerald Keating, an impartial vocational expert, was called to give testimony.  Tr. 55.  The ALJ asked Mr. Keating to assume a hypothetical individual with Kays' age, education, and work experience who was

limited to sedentary work[3] but could only occasionally reach overhead with her left upper extremity. Tr. 56-58. Furthermore, the individual could never climb ropes, ladders, or scaffolds, but could occasionally climb ramps and stairs. Id.

Mr. Keating opined that, though the hypothetical individual would be unable to perform Kays' past relevant work, she would be capable of performing three jobs that exist in significant numbers in the national economy: assembler of small products, telephone receptionist, and clerical sorter. Tr. 58.

III. **DISCUSSION**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown v.

---

[3] Sedentary Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967.

Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful

activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work, and (5) if not, whether he or she can perform other work in the national economy.  See 20 C.F.R. § 404.1520.  The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

### A. The ALJ's Evaluation of the Medical Opinion Evidence

Kays appeals the ALJ's decision on the sole ground that the ALJ erred in refusing to accept the medical opinions of Drs. Khesin and Fisher.  (Doc. 12). Kays also notes that, because the ALJ rejected both opinions, he was left without any physician opinion to support his residual functional capacity determination. Id.

The preference for the treating physician's opinion has long been recognized by the United States Court of Appeals for Third Circuit.  Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  Consequently, an ALJ may reject the treating physician's opinion, but cannot reject that opinion "for no reason or for the wrong reason."  Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).

1. *Treating Physician Opinions*

The ALJ evaluated the residual functional capacity assessment completed by Dr. Khesin, but assigned "little weight" to that opinion. Tr. 17. The ALJ reasoned that Dr. Khesin's opinion was entitled to little weight because it was completed nearly seven years after Kays' date last insured, and because Dr. Khesin had never examined Kays during the relevant period. Id.

The ALJ did not err in rejecting Dr. Khesin's opinion because nothing in Dr. Khesin's opinion made it retrospective. Indeed, all of the language used within his opinion utilized present tense wording, rather than past tense. Tr. 152-53. As Kays' date last insured was December 31, 2004, almost four years prior to Dr. Khesin's opinion, and more than ten months prior to Dr. Khesin examining Kays, the opinion is not relevant in determining Kays' residual functional capacity during the relevant period. See, Corley v. Barnhart, 102 F. App'x 752, 755 (3d Cir. 2004); Martin v. Comm'r of Soc. Sec., 547 F. App'x 153, 161 n. 3 (3d Cir. 2013).

It is particularly important that Dr. Khesin specifically stated that his opinion was based on the results of his physical examinations of Kays. Tr. 152-53. Because Dr. Khesin did not examine Kays until ten months after her date last insured, logically his opinion could not relate back to the relevant period. Furthermore, Kays reported that, in the years prior to Dr. Khesin's examination, her physical symptoms had been in sustained remission. Tr. 195. This is

12

consistent with a general absence of medical records for treatment of neck pain from the period between August 2001 and October 2005.  Finally, the limitations in lifting or carrying imposed by Dr. Khesin were inconsistent with Kays' own testimony, further indicating that the opinion was not based on limitations from the relevant period.  Tr. 51, 152.  Consequently, Dr. Khesin's opinion was not probative of Kays' functional abilities during the relevant period, and the ALJ did not err in rejecting this opinion.

2. *Dr. Fisher's Opinion*

The ALJ also properly rejected Dr. Fisher's conclusory statement that Kays was unable to work. As an initial matter, Dr. Fisher's opinion suffered from the same critical flaw as Dr. Khesin's opinion.  That is, there is no indication that Dr. Fisher's opinion, completed in April 2012, was intended to be retrospective to the relevant period.  Tr. 289.

Furthermore, while treating physician medical opinions are entitled to deference, not every statement or opinion offered by a treating physician is a "medical" opinion.  "Opinions on some issues, such as [a statement by a medical source that you are 'unable to work'], are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner[.]" 20 C.F.R. § 404.1527(d).  The Commissioner will not, and is not required to, give any "special significance to the source of an opinion on" whether an individual is able to work.  Id.

Dr. Fisher's opinion is a legal conclusion that Kays is unable to work, not a medical opinion. Tr. 289. As such, the opinion was entitled to no special weight or significance, and the ALJ did not err in rejecting that opinion. However, even if the ALJ were required to give special deference to Dr. Fisher's opinion, the ALJ would not have erred in failing to address that opinion.

The administrative record reveals a lack "of any significant treatment from 2001 until October 7, 2005" for Kays' medical impairments. Tr. 16. Kays has not offered any explanation for this lack of treatment. Consequently, during that time period there is no indication that Kays' impairments were severe enough to prevent substantially gainful employment, let alone severe enough to require ongoing treatment. Prior thereto, physical examinations were consistently normal, with relatively few findings indicative of any serious symptoms or limitations.

For example, in June 2000 Kays had mild stiffness and pain in her neck, but she had a full range of motion in her shoulders, good strength in her upper extremities, and intact and symmetric sensations and reflexes. Tr. 205. In June 2000, Kays reported "doing much better" and noted that her arm pain had completely resolved and she only had "very mild stiffness and soreness" remaining in her neck. Tr. 203. Kays had a full range of motion in her neck and shoulders, had no tenderness, and an intact neurological examination. Id. She responded well to conservative treatment and had ceased using all pain medication. Id.

14

In August 2001, a physical examination revealed that Kays neck range of motion was full with some discomfort at the extreme ranges. Tr. 198. She had a normal gait and station, along with intact sensation and normal reflexes. Tr. 199. At that appointment, Dr. Gardner noted that Kays was not taking any medication, and was not performing range of motion exercises with any consistency. Tr. 198. The ALJ aptly noted that this suggested that her "symptoms during this period were not as severe as she alleges." Tr. 16. Consequently, the totality of evidence from the relevant period overwhelmingly suggests that Dr. Fisher's opinion was inaccurate, and the ALJ did not err in failing to address that opinion. See, Johnson, 529 F.3d at 204 (finding that an ALJ may reject a treating physician's opinion without discussion where "[o]verwhelming evidence in the record discount[s] its probative value").[4]

3. *Absence of a Physician Opinion to Support the ALJ's Conclusion*

Finally, Kays argues that the ALJ erred in reaching a residual functional capacity determination without the benefit of a medical opinion to support that determination. Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See, Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.

---

[4] For these reasons, the ALJ also did not err in failing to address Dr. Khesin's conclusory opinion that Kays was unable to work. Tr. 290.

15

1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence"). See also, Maellaro v. Colvin, 3:12–CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014); Gormont v. Astrue, 3:11-CV-02145, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013); Troshak v. Astrue, 4:11-CV-00872, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012).

Despite the general rule that an ALJ must invoke a physician opinion in support of his or her residual functional capacity determination, this case presents the rare occasion where an assessment was not required. While Kays claims disability based primarily on her neck impairment and concomitant symptoms, the administrative record reveals a distinct lack of treatment from August 2001 until October 2005. In October 2005, Dr. Khesin noted that Kays' neck pain had been "in remission" until October 2005. Tr. 195. This supports a conclusion that Kays was not significantly limited during most of the relevant period.

Furthermore, from 2000 to 2001, Kays' medical treatment records do not indicate any physical limitations beyond those imposed by the ALJ. Kays herself testified that she had been able to lift up to ten pounds comfortably, consistent with the lifting requirements of sedentary work. Tr. 51. While Kays testified that she had some difficulty with sitting and standing, tr. 51, no medical record documents

16

any complaints of difficulty in these areas. In fact, physical examinations generally contradict these limitations. At every examination, Kays had intact reflexes and sensations. Tr. 199, 201, 203, 205. She had full strength throughout her extremities, had a normal gait and station, and in June 2001, was able to sit and stand independently. Tr. 199, 201, 205.

In October 2005, at a time when Kays was experiencing a relapse of neck pain severe enough to require an emergency room visit, she did not have any difficulty walking. Tr. 195. Her gait, station, and reflexes were normal, and she had full strength throughout her extremities. Tr. 196. Thus, the medical evidence established that Kays did not have any significant limitations in her ability to sit, walk, or stand.

These facts demonstrate that the ALJ was justified in reaching a residual functional capacity determination without the benefit of a supporting medical opinion. In that regard, the records relied upon by the ALJ are similar to those that the Third Circuit concluded were sufficient to support the ALJ's decision in Johnson v. Comm'r of Soc. Sec. 398 F.App'x 727, 736 (3d Cir. 2010). There, the ALJ relied on three significant pieces of information in reaching a residual functional capacity determination. First, the ALJ noted that objective tests demonstrated that the claimant's impairments would not "preclude all work activity." Id. Second, the ALJ noted that the claimant had not been treated for her

impairments in two and a half years.  Id.  Third, the claimant had failed to follow her prescribed medication.  Id.  The Third Circuit concluded that this was "a sufficient evidentiary foundation" to support the residual functional capacity determination.  Id.

Similarly, here the objective testing discussed previously did not support greater limitations than the ALJ found.  The test results were generally normal and revealed few, if any, functional limitations.  Additionally, while in Johnson the claimant did not seek treatment for her impairments for two and a half years, here Kays did not seek treatment for her impairments for approximately four years.

To the extent that Kays did have any significant physical limitations, the ALJ accommodated those limitations based on Kays' testimony.  The ALJ accommodated Kays' complaints of constricting pain in her left arm by limiting her to only occasional overheard reaching with that extremity. Tr. 14.   The ALJ accepted, without question, Kays' self-reported ability to lift a maximum of ten pounds comfortably, and therefore limited her to sedentary work.  Id.

Additionally, it is significant that no doctor ever opined that, during the relevant period, Kays was more limited than the ALJ found her to be.  See, Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical opinion that supports [her] allegations that [her] pain and exertional limitations are more severe than the ALJ found them to be .").

Given this lack of evidentiary support for Kays' claim, and in light of the facts outlined above, the ALJ did not err in reaching a residual functional capacity determination without the aid of a medical assessment.

IV. **CONCLUSION**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An order consistent with this memorandum follows.

BY THE COURT:

s/Yvette Kane
Yvette Kane
United States District Judge

Dated: December 10, 2014